the Federal Register the preamble and so on and even there time and again they say we actually think it's working and then they say to the extent there's a problem we're devising a 50% reduction scheme to go into effect so a state like New York can come and say to the Secretary look we think it's out of whack reduce these payments by up to 50% New York could have done that by August 1 2018 they didn't do it. Has the agency objected to New York's plan to its adjustment that were in 2017 and 2018? Well I don't know that the agency has taken a position either way on the specifics of New York's plan but the agency has promulgated a regulation and that regulation is on the books it's paid it's 310A. Did you seek their intervention in any way in this in these proceedings? The district court here did ask them to participate and they did not and I think they didn't your honor for two. They have it they have enforcement authority here too. They certainly do we don't and the record shows no action by them to make. Either way but the statute that I read to you Judge Carney requires an affirmative determination by the Secretary to bless the New York scheme not a it can't be the default rule is that the these rules are all swept away and that's particularly so because the text of the regulation which is in effect it's 310A and it's found in our attendant to our brief at page 5a says quote any state that elects to operate an exchange but that does not elect to administer risk adjustment which is undoubtedly New York quote will forgo implementation of all state functions. That's an existing regulation it's on the books and so to the extent you have as Judge Carney I think the natural question where is HHS in this? HHS is right here in this regulation a formal regulation that says they can't do what they're doing and this court has never hesitated to strike something down on preemption grounds. Why isn't HHS a defendant here don't you have a claim against them under the ADA? No we think actually that HHS right is following its regulations and and those regulations preclude what New York is doing. Now to the extent that somehow there's some informal thing or whatever like that I suppose a challenge could be brought if HHS were acting on that and trying to make a determination in the absence of the Secretary that the regulation is approved. Going forward they seem to have blessed the procedure by making it official for the 2019 calendar year haven't they? No not at all Your Honor and so I think that's really important that's their best argument it's found at their brief at page 15 and it relies on a snippet from the preamble to a 2018 regulation that 255 page regulation. That regulation is largely about the 50% reduction scheme as describing earlier and it makes no sense to think they'll be going and blessing some unilateral scheme by New York when they spent all of that time and effort requiring data to be produced by the to the HHS and saying the HHS is in the driver's seat as to whether to approve a 50% reduction. This is from the HHS when they were asked whether the New York adjustment can be seen as permitting states to make adjustment without approval. Their response was amazingly unhelpful. They said states could examine whether any local approaches are warranted to help ease the transition for new. This is at 16960. Exactly. And then and then continued states that take such actions and make adjustments do not generally need HHS approval as these states are acting under their own state authority and state resources which the district court found very compelling but then they go on and say however the flexibility finalized in this rule involves a reduction to the risk adjustment transfers calculated by HHS and will require HHS review as outlined above. So they seem to be on all three sides of this. I don't think they're on all three sides. I think it's telling that my friends on the other side in their reply brief omit those words about requiring HHS review and in the reply brief omit using state resources. So that part I think is very important. I think when taken as its whole and if you look at the last five pages not just page 60 but 55 to 60 it makes clear HHS is generally in the driver's seat. Now not always. What they're saying I think there is that if there are there are things that New York can do. For example they spend a lot of time talking about windfalls and so on. New York sets the premium rates and they set them at the front end and they say 82 percent of all of the money coming in has to be spent on medical expenses and then on the back end at the end of every year if an insurance companies like our clients have some sort of profit and 82 percent is not spent on medical expenses they've got to rebate that back. And so I think what's going on in that statement about state resources is it's saying look New York you can have all sorts of regulatory things you can do. The one thing you can't do is unilaterally reverse the federal risk adjustment scheme. Why? Because here it's 30 percent in a state like New York which will have different motivations. But tomorrow it can be Texas at 90 percent or a hundred percent of these payments. I think that was hostile to the whole plan. Exactly and that would undercut the whole point of the national solution of the Affordable Care Act and allow and empower unilaterally states to do and tinker with this in different ways. Would HHS post hoc approve what happened here? I think that they probably could. I don't know. My friends on the other side haven't made that argument but at least strikes me as a better argument if it complies with the text of the statute 18041B. A secretary determination that the state standard comports with the federal methodology and the federal goals. If they did those things I think we'd be in a different ballgame. But they didn't. They didn't. And also in that. Sorry. Have you delegated that power to anybody? Not to my knowledge. I mean not to my knowledge and certainly not to some phone call by some informal staffer. And so I think that underscores Judge Lohier the real danger of their approach. And that's why, you know, to the extent that you're concerned that sometimes states are going to be, you know, the federal scheme is going to be out of whack in a particular place. That's why HHS has done several things including the 50 percent reduction scheme which is at the heart of what that big 255 page federal register preambles about. The rule going forward for the calendar year 2019. Is that it? The 50% reduction? Exactly. They could have sought it by August 1, 2018 and it is so telling that they didn't do that. So they complain in their brief about the New York data being all out of whack and so on. Look at their brief. That data is from 2014 and 2015 and we complained about this in the district court at document 37 and 46. We said look this data is old. The newest data which at that point was from 2016 shows New York is not out of whack anymore at all and they keep on relying on this old data. As of what year was it no longer out of whack? 2016. So the 2017 adjustment that was promulgated is based on data that worked and was compatible with the federal. We don't know Judge Carney exactly what their methodology was when they decided to do this 2017 risk adjustment reversal. It hasn't been provided and I do think that's another thing about the federal scheme is it requires stakeholder input from all sorts of folks in the statute itself. Insurance commissioners, insurance companies, consumer organizations. None of that exists with the New York scheme and that's one additional reason why. There were emergent circumstances where there was a major and very significant unintended consequence that was inconsistent with there being a rational federal risk adjustment program. This was brought to their attention by the states and there were emergent matters, you know, adjustments made to compensate for that. The agency is now caught up with that issue and issued this new way of dealing with the unintended consequences going forward. Why shouldn't there be a procedural flexibility in making those adjustments in an emergent circumstance? So two reasons. Number one, they haven't provided any data that says that. That's only for 2014 and 15. And two, to the extent that that is a problem, there are many mechanisms in the existing law. That 82% rebate figure would require insurance companies like United to give money back if they received any sort of windfall. And indeed, and this is I think what that snippet of reporting is getting at, New York could say we're going to have a reinsurance program as there was before 2016. So if any insurance company faced tremendous medical expenses that they didn't think that they were going to incur at the beginning of the year, New York can use its own funds to say on the back end, look, we're going to prop up and make sure that you're made whole. But these were of a magnitude that was really unexpected by either the federal government or the state government, wasn't it? Well, again, I think that's only at the very front years that that was the magnitude when it was first started. And I think now, you can look at these numbers and say, wow, they're very high. But they're high for a reason. United and Oxford are going and insuring riskier patient populations. That's the whole point of the risk adjustment scheme. If you didn't do that, you'd have a massive adverse selection problem where every insurance company would be incentivized to take only the healthiest in the populations and that would then trigger the death spiral that the entire Affordable Care Act. The problem that the ACA is trying to address. Exactly. Counsel, the district court seemed to be very reliant on the fact that insurance is typically a state issue for regulation and he was willing to make some concessions to the state superintendent because of that long tradition. Do you think that was misplaced? I do. So we don't doubt that it is generally a state function, but the Supreme Court has said in Barrett Bank, as long as a statute specifically mentioning insurance, a federal statute, then McCarran-Ferguson doesn't apply. And I don't think there's any doubt that this statute, the Affordable Care Act, is all about insurance. So I think that the standard rule which the Supreme Court set in GAID is that even if you're dealing with a heartland  of a state's police powers, if you have a federal statute like this one, which invites state regulation and says come to a federal agency for approval, that's really a very strong indicia that the statute preempts the state regulation. But it has a savings clause. It says it is expected to be in effect unless it prevents the application of the federal law, right? Absolutely, Judge Carney, as did GAID. And here's the most important point about GAID, quote, this is from page 99 of the opinion, the principal indication that Congress intended to preempt state law was the requirement that a state shall submit a plan if it wishes to assume responsibility for the issue. And that is exactly on fours with that 18041 statute that I read to you. Now there is a little difference in the wordings of the savings clauses, but I don't think here it matters. The savings clause here says, and this is at page 2A of our appendix, quote, nothing in this title shall be construed to preempt any state law that does not prevent the application of the provisions of this title. And as we have explained, the New York scheme overrides the federal standards that the Affordable Care Act mandates. It prevents the application of the risk adjustment provisions that I began the argument with, section 18041B. Thank you. You've reserved three minutes for rebuttal. We'll hear from New York State. May it please the Court, Stephen Wu for the Department of Financial Services. Plaintiffs are wrong to argue that what happened here was unilateral state action to reverse a federal program. To the contrary, what the Department did here was exactly as the statute envisioned, to consult with HHS to determine whether there were problems with the initial federal methodology. It says formal approval by the Secretary, doesn't it? It does not, Your Honor. I mean, the statute talks about the Secretary being obligated to consult with the states to come up with criteria and methods for accomplishing risk adjustment. And that is squarely what the Secretary did here. This is a situation, again, where the ACA, a massive new federal program, came into existence. It inserted itself into what had already been, for a century, comprehensive state regulation of the insurance markets. And this was a transitional period where they were working out cooperatively with the states how to manage the transition from the previous regulations to the new ones. And what happened here was exactly what Judge Carney identified. The federal methodology was issued for the 2014-2015 plan years. Data came out showing that there were disproportionate, unintended consequences in New York. And importantly, those consequences meant that the federal methodology at the time failed to achieve federal objectives, which is to stabilize the insurance markets and to ensure that there was an accurate assessment of actuarial risk. Why didn't you seek approval from the Secretary if there was actual disequities? So the Department did. And that is not seriously contested in the record. The history of this program was the Department went to the HHS, or maybe the HHS came to us, there was an ongoing collaboration about the best way to accomplish risk adjustment in what is, after all, a state insurance market. And the answer that HHS provided and has repeatedly stated in its rules about risk adjustment was to approve local approaches under state authority to deal with unintended consequences. But there's no document that says we're going to do a 30% overlay of your program, okay? And, you know, a sign-off. There's a record of some problems. There's nothing explicit about what the proposed remedy would be. I know that there are the invitations by HHS for states who are experiencing severe difficulties to look at their own regulatory authority. But this falls pretty short of a real sign-off by the Secretary, doesn't it? What's your best evidence that they knew about this particular program and agreed to it? Sure. So here are the pieces, I think. Number one, what is stated in the regulations about risk adjustment is, as you've identified, this sort of broad recognition that local approaches under state authority are appropriate. This invitation for states to take up that authority in order to deal with unintended consequences. And, again, that's been stated since the May 2016 rulemaking, all the way to the April 2018 rulemaking, where people raised New York's program specifically, asked if it was permissible. My question is about approval. I mean, to me, squarely, this is about whether this scheme requires the approval of the Secretary in every case. And here, also, whether what happened was sufficient approval under both the statute and the regulation. Well, and let me answer this quickly in this way, which is what the Secretary and what HHS determined was that in light of the unintended consequences, because of state-specific factors, they would allow states to exercise their own authority to deal with those consequences. And bless that, that's expressed in the regulations. New York then took up that invitation and promulgated this rule. And what we know from the record is that there was extensive consultation between the state and HHS about this specific program. You agree that New York State did not elect to administer risk adjustment? Correct. This is a fundamental division that I think plaintiffs tend to have to administer what's known as the federal methodology, which is, you know, under federal standards approved by HHS. But they have expressly recognized that states have, you know, inherent separate authority predating the ACA to accomplish risk adjustment on their own. And that is what is discussed in, among other places, the April 2018 rulemaking. What HHS is making the distinction between there is flexibility under this rule, which means flexibility to adjust the federal methodology itself. And state authority. But the 310A3 does not seem to really allow for much flexibility where the state does not elect to administer risk adjustment. It will forego implementation of all state functions in this subpart. Yeah, but the in this subpart language is the important one. And if you look at the regulatory language, it repeatedly refers specifically to the federal methodology itself. And the idea, again, is that if you want to have a methodology approved under federal standards and administered by the agency. Counsel. At worst. I didn't mean to interrupt the sentence. But when you talk about the flexibility, the rule says that the flexibility finalized will require HHS review as outlined above. So they don't talk about consultation. They don't talk about meetings. They talk about review. But I think at worst the federal regulation is silent as to the question of independent state authority under their own risk adjustment programs. Again, it refers explicitly just to the federal methodology. Judge Poole was referring to 16960. Correct. And after talking at length about flexibility, I'm just trying to understand what's going on because it's confusing. After talking at length about precisely the forms of flexibility that you've just described, it seems to require some form of approval. And maybe there's a separate issue about whether the approval, whether you got that approval, but it seems to require that by its very language. So the distinction here is approval to modify the federal methodology, which as HHS explained in the April 2018 rulemaking requires federal approval under federal standards. But again, what the agency has separated out from that system is local approaches under state authority, which they explicitly said do not require federal approval at all. Why would they do that and make it so much more complicated for states that want to enforce their own methodology? Why would they do that when the statute seems to be crystal clear? Well, so there's two answers to that. I mean, one goes back to the origins of this exact policy, which is that there were New York-specific factors that made the federal methodology not work here. And again, what didn't work here was to accomplish the objectives in the ACA. What New York found was that the application of the federal methodology was destabilizing the market. It was driving insurers out of the New York market, as our amicus explains. Because of New York factors that the federal methodology at that time did not consider. And so the transitional approach... Can I just interject? So your adversary says that the data was for 2014, but that that, if I understood correctly, that those child-counting methods and loss-expensing methods, those were rectified, those were reconciled in later years. Is that incorrect? Maybe I misunderstood. No, that is incorrect. I mean, the state 2017 plan year adjustment itself acknowledged that there were still problems from the federal methodology, and I think approved, I believe, an 18 percent change in the federal risk-adjustment payments to accommodate those difficulties. That's much less, though. They're coming closer to parity, aren't they? Correct. It's much less. And I think that's no surprise. I mean, as the rulemaking itself envisions, there's supposed to be continued work between the agency and us. Why didn't you use the latest data you had in this case? Excuse me? Why didn't you use the latest data you had in this case? Why did you use 2014-15 instead of 16? Well, number one, for the 2017 plan year, DFS is using data from 2016, is my understanding. But maybe the other answer to your question is that all of this stuff lags years behind the plan years. I mean, you get data from the administration of this program for a plan year, a year, a year and a half earlier, and only then propose changes to sort of correct for deficiencies in there. I mean, this is part of the reason why it wasn't until 2016 that HHS began to identify the problems from the 2014 plan year. But what's at stake in this case is the 2017 attempted adjustment by New York State. That's correct. And why weren't you using the 2016 data in that case? Those adjustments did use the data for the relevant plan year. And this court in the interim state proceedings did prevent the application of that adjustment. But it is not the case that it relied on, I would say, outdated obsolete plans. That's the procedural posture where there's a stay in place on these transfer payments, correct? That's correct. That's correct. And I want to make another sort of broader point here, which is that what HHS has done here and DFS is fully consistent with the statute. And I know that this would never happen in New York State, but let's say that we were in Texas. Could the state of Texas, well, could state X, let's put it that way. Let's be neutral. Could state X completely undo the federal risk adjustment transfer? So I think the answer to that is no. Why not? And the reason is because a core predicate of our argument is HHS's involvement and sign-off on what New York has done here. I mean, I think assumed within the idea that a state would, for instance, do a hundred percent reversal of the risk adjustment is the federal agency would never approve that. It would not accomplish federal objectives. But they didn't approve this either, did they? No. But it did. It reviewed it. It expressly allowed states to proceed. And I should be clear, the language— It's interesting, Mr. Wu, by the way, that in arguing that you don't require approval, you also argue that you sought approval. So at some point, the state believed that it needed some form of approval or some sign of approval from HHS. Yeah. I mean, and again, this is the distinction that I think is clear from the language in the regulations is approval to do its own thing under state authority without federal supervision. What is a change in methodology? The change in methodology is basically to make further adjustments that account for features of the New York program that federal law does not—that the federal program at that time did not accommodate.  They got approval. They got approval. And the approval was in the nature of this ongoing collaboration? That's correct. What New York identified and HHS agreed was that there were unintended consequences from the federal methodology. And to deal with that problem, again, what HHS determined was that states should exercise local approaches under state authority. Is there an intentional support for your—I think your proposed distinction between informal and formal approval? So I would say there's two answers to that. One is that the statute doesn't preclude that kind of division of authority. And the statute, which broadly talks about the secretary's oversight over, you know, risk adjustment programs and requires consultation with the states, has to be understood against the backdrop where the states had risk adjustment programs, had preexisting authority, and even under the federal program continued to regulate these insurance companies. I mean, I think it is very telling, for example, that plaintiffs here suggest that the states could have responded by adjusting the rebates that these insurers are required to pay under state law. I assume that if the state had said your rebates are adjusted because of the effects of the federal risk adjustment program, we'd be right back in this court as well. How does the record make clear exactly what HHS informally approved? Well, so in two ways. One is that HHS identified what it called disparities between what the federal methodology looked at, which is the use of this national data set that did not take account of local factors, and expressly required or acknowledged the states could proceed. That's a very generic thing. How do we know that they didn't approve 40% transfer back or 20% transfer back? Well, and I think the most direct, and maybe the most direct response to that is that in April 2018, when commenters specifically asked HHS whether what New York had done in this case was appropriate, HHS responded by saying, basically, those are the local approaches under state authority that we've been talking about since 2016. Well, what's generic is the language, because HHS has been using the same language since 2016. What is not generic is the reference to the New York program, which quite pointedly was about the very risk adjustment program at issue here. Let me ask a quick question about the program. In some of your materials, it seemed that the state was anticipating or continuing to apply the program in 2020 and beyond, but I wonder whether that was so given the appearance of these new regulations that anticipate a 2020 program by the feds. So I'll answer it in this way, which is that the framework is in place for further adjustments on top of the federal risk adjustment program for 2020 and beyond. Of course, we haven't yet seen what happens with this 2020 methodology, which doesn't take effect until the 2020 plan year, as I understand. So the question of exactly how the states and the federal government will deal with that situation in a couple of years I don't think is squarely presented here yet. Your argument is that the new rules will make explicit what were, you think, implicit approval before the new rules were published. Well, I wouldn't go quite that far, and I don't think HHS has either. I mean, again, in the April 2018 rulemaking, HHS created this procedure for the federal methodology to be adjusted for state-specific factors. Which they were doing before they issued this rule. Correct. But even in that rulemaking, and this is at the end of that page 60 part of the regulation, HHS again reiterated that they continue to recognize that local approaches might be appropriate. I mean, I think taking a step back, I think the general problem here is that this is not exactly an area that is amenable to sort of in advance clear lines. I mean, what happens here is these are extremely complicated markets where there are lots of unintended consequences from regulations. And the history of this program, including the federal program, was to sort of make the system work. And fundamentally, how DFS approached this issue was to determine, again, in consultation with HHS, that federal and state objectives were not being met. The fundamental purpose of risk adjustment... Am I right in understanding that the state never heard from HHS that it got a directive to stop doing what it was doing? That's exactly correct. And HHS has every power under the statute to both say that, and more importantly, to have direct enforcement power. That's part of our Armstrong argument. You're equating failure to stop with approval. Well, it's not that. It's two points. I mean, one, we do have a separate Armstrong argument that says that HHS's quite explicit authority to determine whether states are in compliance and to enforce that removes private equitable relief from the equation. But separately, HHS's involvement with DFS and the specific program here and its sort of repeated endorsement of local approaches is extremely powerful evidence that there is no conflict with federal objectives. And to be clear, the state and the federal objectives here are the same. They are to stabilize the health insurance markets. They're to ensure an accurate assessment of comparative risk. But the law suggests that it's not just parallel objectives or shared objectives, but methods as well. You know that case language. And doesn't this look like maybe looking at the same objectives but having different methods? Well, except that, of course, HHS has expressly endorsed local approaches under state law. I mean, the contrast with a case like Gade, for instance, is one where in Gade the federal agency came in and said explicitly, we do not want states to enforce their local laws, and they relied upon an express preemption provision that said on the issue of safety. The caveat is you can't change the methodology. You can't change the federal methodology under their rules. But what HHS has acknowledged is that there is a separate state authority to accommodate local concerns, and they have just decided that that change is outside of the federal methodology altogether. And, again, the shared project here on the state and federal level is to ensure that risk adjustment accurately accounts for differences in the relative health of the enrollee population for these different insurers. That's why HHS has adjustments within the federal risk adjustment program. It's why we have these programs as well. And the joint determination at the federal and state level was that the federal methodology was not accomplishing that goal, that it was leaving disparities in place and, in fact, worsening disparities, making the health insurance marketplace worse off. It has heightened formalism over practicality to say that the federal government was required and the states were required to adhere to a methodology that regulators on both levels agreed was not working. And all that DFS is asking for here is for this court to endorse a program that the federal government has approved of, that the federal government has agreed accomplishes joint objectives together. That is very far from the type of conflict preemption that would require invalidation of the program. Thank you. Mr. Wu, I should disclose that Mr. Katyal and I are going to be on a panel, so I may have to deal with him in the next week or so, but we're in equipoise because your colleague is my excellent former law clerk. I'll take that. Thank you. You've reserved three minutes for rebuttal. So I find it compelling when opposing counsel says that we have the same goals, the state and the federal, and that's to protect the insurance markets in the state, make sure they don't fail. I don't doubt that. It's just unfortunately precluded by this court's decision in Clear Air Markets, page 87. Quote, even when federal and state statutes have a common goal, a state law will be preempted if it interferes with the methods. What are you reading? This is the Clean Air Markets decision by this court. It's also the Supreme Court decision in Oliette, which says that you can share the same goals, but if you have a federal scheme that puts the federal government in the driver's seat, it's undoubtedly preempted. Now, my friend in response, Judge Carney, to your question, what is the best evidence that this scheme was approved, his answer I thought was very telling. He said, quote, here are the pieces, because he couldn't point to any one thing. He pointed to four things as I counted them. They all add up to nothing. The first is, he said, HHS said local approaches are okay. That's fine. We don't disagree with that. It's a question of what local approaches. The ones that I offered to you in my opening, absolutely fine. Unilateral scheme to reverse the federal scheme, not okay. He then says, second, that they consulted. That's great. Consultation is not secretary determination, which is what the statute requires. His third piece of evidence, the HHS states can accomplish risk adjustment on its own. Look throughout his brief. Look throughout the record. You'll never see that anywhere. HHS has never once said anything like that. They keep asking for that. They've been asking for it for five years from HHS, but HHS has never given, and as Judge Lohier said, the text of the regulation, 310A, squarely forbids it. And then lastly, that textual snippet, which we've been talking about, but exactly for the reasons Judge Pooler, you said, the last line says, you need HHS approval. Now, here's why this is so important, because I think it's all illustrated by Judge Lohier's question about state X and the 90% figure. When you asked my friend about that, he said, no, HHS would never approve such a thing. But his whole argument, all four of these snippets are generic approvals. He doesn't have some standard. Mr. Cottrell, if this is so egregious still, don't you find it surprising that HHS is nowhere to be seen? I think that is undoubtedly their best argument. It's not the one he made, but I think you're absolutely right. That's the best argument. That has the strongest intuitive power to me, at least. Yes, and I'd say a few things about that. Number one, the regulation itself that you pointed to shows that they are here, that there's a flat prohibition in the regulation. Second, the Supreme Court in Wyeth v. Levine at page 576 says agencies have no special expertise when it comes to preemption. And, indeed, in Wyeth, the Supreme Court- But they have enforcement powers. Sure. Don't they have explicit enforcement powers to go after noncompliant states? Absolutely, Your Honor, but I think- You're 100 percent right, but I think that the general rule, and it's illustrated by the East Hampton case, is that even when an agency doesn't go after something, it can still be preempted, and that's exactly what happened in that case. But, look, your argument relies, I think, mostly or most powerfully on Gade and this approval process, correct? Well, even in Gade, in the Seventh Circuit, before it came to the Supreme Court, the agency was nowhere to be found, and the Seventh Circuit still struck the scheme down. It was exactly on all fours with this. True, at the Supreme Court, the agency filed a brief saying it was preempted, but I think the Supreme Court has said time and again, and Wyeth is a very good example, this court's decision in Steele Institute by Judge Jacobs is another example in which the court has said, we don't think agencies have any special expertise when it comes to preemption. And, yes, there is that alternative enforcement mechanism, just as there was in all of the Armstrong line of cases, but if the regulation and the statute requires a secretary-level affirmative determination, you'd be flipping things. Can you again point me to the language that you rely on in the statute  Yes, so it's found in our addendum to our brief at page 1A. It's 18041A. So A provides that they have to issue, that the secretary shall issue regulations, and B says that if a state implements a health exchange, it, quote, shall adopt and have in effect the federal standards established under subsection A, or a state law or regulation that the secretary determines implements the standards under the state. They are imposing their own risk adjustment standards, entirely undoing the federal scheme. Now, they say, oh, it's just a whole separate risk adjustment program. There is no such thing. It's just like saying if you're a store and there's a 50% sale on goods, if the cashier at the back end, when you're checking them out, can reimpose the 50% to bring you up to full price, you're paying full price. Here, everyone under the scheme is paying exactly the price, is under the New York scheme, is paying a different cost and benefit getting different numbers than what the federal government has published. The federal government published that clients like ours should get a certain amount of money. Others should pay a certain amount of money. What they have done is take a 30% or whatever reversal of that. If they can do it here for 30%, state X can do it for 90% or 100%. In fact, the agency contemplates 50% upcoming. Exactly. Correct? So this is of an order of magnitude still that is in keeping with that. Well, except that, it requires HHS approval for the 50% and they've specified all the data that's got to be provided and a consultative mechanism whereby stakeholders... retrospective enactment of what they in fact engaged in with the state of New York in this circumstance. Oh, it doesn't meet either the process or the substance that's required by that regulation. And indeed, in that promulgating that regulation, HHS said, look, we actually don't think there's anything wrong with our risk adjustment payment schemes over the last years. We know there have been criticisms, but to the extent there are, here's the way to fix it. Here's a process. Here's a substance that's required. And they never bothered to even go through that process. And they could have. The deadline was August. That process was available to them for FY 2017? It wasn't for 2017, but even now. So the process is available going forward and they never went through it. Now, in earlier years, like 2014 and 15, they didn't try and do anything like the confiscation scheme. So the first year they tried was 2017. And we submit to you, if you allow that unilateral scheme for 2017, you'll allow it for any year at any number. Because there is no requirement of specific approval under their test. They're looking at generic indicia. And that generic indicia cannot get to what they need under the statute. What would happen if HHS tomorrow, after this or Monday after this argument, officially approved their method in the way that . . . Retroactively? Retroactively, yes. I will not kid you, Judge Lohier, that would be a very, very different case in that circumstance. If it tried to meet the statute, the secretary determines. All they've got is some phone calls by some unnamed person. That is not secretary-level approval. HHS has not expressed an opinion privately or publicly about this lawsuit at all? Not to my knowledge. Judge Codall asked them to participate, right? Correct. They weren't able to file a brief timely? Yeah, they didn't file a brief, and they didn't file a brief . . . They never appeared? They didn't file a brief here either. And again, that's kind of like . . . They filed a brief below? They didn't. They did not. They were invited to and did not. Exactly. In this court in Friends of East Hampton had the same situation, and the agency didn't participate, and the court found that scheme preempted. The agency responded before Judge Codall, but just said, We can't make the filing deadline you've set. And he felt some urgency and then went forth, right? Exactly. And then they didn't participate. Not that they ignored the invitation. That's correct. I'm not saying that. I'm just saying they never . . . They didn't provide the decision . . . The kind of hypothetical that Judge Lohier was suggesting. Can we draw any conclusion from their nonparticipation? Well, I think you can, because there's an existing statute . . . Existing regulation 310 on the books, which is as clear as day. And indeed, Encino Motor Cars says that if they're going to deviate from that, they have to provide a reasoned explanation. And silence is definitely no reasoned explanation. Thank you. Thank you both. Very good argument. We'll reserve decision. The stay is in effect until we reach our . . . Until we publish our decision. Is that your understanding? Or does the stay end today add argument? Do either of you know? Pardon me? Until this court decides? Is that what the language of the stay is? Thanks. What? It's as well as appeal is pending. Ah. Oh. Thank you.